# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| ROXANN WATSON ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-6006-CV-SJ-NKL-SSA |
| ) | |
| MICHAEL J. ASTRUE ) | |
| ) | |
| Commissioner of Social ) | |
| Security. ) | |

**O R D E R**

Plaintiff Roxann Watson ("Watson") challenges the Social Security Commissioner's denial of her claim for disability insurance benefits and Supplemental Security income under the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq.*, and 1381 *et seq*.

Watson's initial applications were denied and she appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing, the ALJ found that Watson was not "disabled" as that term is defined in the Act. The Appeals Council denied Watson's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner, as such, Watson's appeal is properly before this Court. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

For reasons explained below, the Court remands the matter to the ALJ for further proceedings in accordance with this Order.

**I.** **Factual Background**

1

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]

### A. Watson's Medical History

Watson was born on February 8, 1967, and was 37 years old at the time she filed for disability on June 7, 2004. Watson alleges she is disabled due to arthritis and depression and that her disability began August 30, 1999. Watson's medical record demonstrates consistent complaint and treatment for arthritis.

Watson's medical record also contains several complaints of and treatment for depression. Watson was hospitalized from May 19, 2004 through May 24, 2004, after an intentional overdose of antidepressants and high blood pressure medications. When she was discharged, she denied any further thoughts of self-harm and was hopeful that her medications would help her depression. Her discharge diagnosis stated that her depression was in partial remission.

After her hospitalization, Watson was referred to psychiatrist Henry J. Wisdom, D.O., for outpatient counseling and medication management. She also participated in counseling sessions with Michael Seitz-Mitchell, a licensed social worker, who noted that she was improving, that her depressed mood had decreased, and that she was going through a normal grieving process related to her divorce and other family issues. Watson also met with community support worker Ann Miller on a frequent basis to track medication compliance,

---

[1] Portions of the parties' briefs are adopted without quotation designated.

to help her access community services, and to help her with self-esteem issues. Miller frequently noted that Watson had good hygiene, a clean home, smiled often, made good eye contact, was friendly, and dressed appropriately. Miller also described Watson as very motivated and very articulate. Watson also saw nurse practitioner Dorothy Milburn for medication management and general treatment.

In November 2004, Watson was evaluated by Patricia Hogan, D.O., a psychiatrist. Dr. Hogan's examination showed decreased psychomotor activity and sometimes illogical flow of thought. Watson was anxious and depressed, but not suicidal or aggressive. Her memory was generally intact in all spheres, intellect was within normal limits, and insight and judgment were fair. Dr. Hogan diagnosed Watson with recurrent depression and anxiety disorder, and recommended that she continue her medication and counseling.

Though the progress reports in 2004 were positive, Watson told Miller that her depression was worse on January 9, 2006. Watson saw Dr. Hogan again on February 3, 2006, for a psychiatric evaluation. Dr. Hogan's exam showed that Watson was alert but her psychomotor activity was decreased and her attention and concentration were impaired by pain distraction. Dr. Hogan also noted Watson's mood was depressed. Watson denied being suicidal and there was no evidence of delusions or hallucinations. Watson's insight and judgment were also good. Dr. Hogan diagnosed recurrent major depression and assessed a global assessment of functioning (GAF)[2] score of 40. She recommended that Watson

---

[2]The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is rated with respect to psychological, social, and occupational functioning, and

3

continue her medications as prescribed.

In February and March 2006, Milburn and Miller both noted that Watson appeared stable and was doing well with her medicine and counseling.

**B.     The ALJ's Decision**

In his written decision, the ALJ set forth the requisite five-step process for making disability determinations.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003).  Applying that process, the ALJ determined that Watson had not engaged in substantial gainful activity since May 1, 2004.  He found that her degenerative joint disease of the lumbar spine and joint pain qualified as a severe impairment under the Act, but that these impairments did not meet or equal the listed impairments.  The ALJ found that Watson's claimed disability due to depression was not severe because her depressive condition is controlled by medication.

Considering the evidence of record, the ALJ determined that Watson's degenerative joint disease and joint pain could produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not fully credible.  The ALJ found that Watson's mental impairments resulted in a "mild" restriction of her daily living and social functioning, concentration, persistence and pace.

The ALJ then considered the Vocational Expert's testimony.  The ALJ found that,

---

should not include physical or environmental limitations.  A GAF score of between 31 and 40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *See* Diagnostic and Statistical Manual of Mental Disorders, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR).

4

considering Watson's age, education, work experience, and residual functional capacity, Watson had been capable of successfully adjusting to work that exists in significant numbers in the national economy. Ultimately, the ALJ determined Watson was not disabled.

## II. Discussion

Watson appeals claiming the ALJ erred (1) in finding her alleged depression was not "severe"; and (2) in failing to address the opinion of nurse practitioner Dorothy Milburn.

The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Watson does not have a disability entitling her to benefits. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id*. (citations omitted). In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *See Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). The Court must defer "heavily" to the findings and conclusions of the ALJ. *See Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

### A. The ALJ's Determination that Watson's Depression was Not "Severe" is Not Supported by Substantial Evidence

The ALJ stopped his analysis regarding Watson's alleged disability due to depression at step two of the sequential evaluation process. *See Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (noting claimant has burden of showing severe impairment at step two, but that burden "is not great").

5

The second step of the evaluation process focuses on the severity of the impairment. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience for not less than twelve months. *Id*. at §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). Basic work activities encompass the abilities and aptitudes necessary to perform most jobs. Included are physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, performing, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work situation. *Id*. at §§ 404.1521(b), 416.921(b).

"The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Caviness*, 250 F.3d at 605 (citation omitted). At step two, "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (citation omitted). The First Circuit has explained that step two is "a threshold test of medical severity to screen out groundless claims-i.e., those claims that, on a common sense basis, would clearly be disallowed were vocational factors to be considered." *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1123 (1st Cir. 1986). Only those with "slight abnormalities"

which do not significantly limit "any basic work activity" can be denied benefits at step two without undertaking the subsequent steps of the disability evaluation process. *See Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir. 1987) (citations omitted).

The ALJ focused this determination only on Watson's isolated suicide attempt in 2004. The ALJ also stated that Watson's depression was not severe because her depression was treated and controlled by medication.

The ALJ's determination is not supported by the substantial weight of the evidence. Watson's medical record demonstrates that her depression was part of her clinical profile before her suicide attempt and that the severity of her symptoms and their consistency over time supported a determination that her impairment was severe.

The medical record shows depression had already been part of Watson's clinical profile for several years before her suicide attempt in May 2004. Watson's medical records with Theodore Rights, M.D., Watson's primary treating physician, mentions a diagnosis of depression in his notes in November 2001. Other treating physicians note depression-like symptoms in their notes, as well. Wendell Bronson, D.O., wrote that Watson's "affect is a little flat" on March 27, 2002. Mark Manuele, D.O., noted Watson felt "malaised, fatigued" in November 2002.

Additionally, on May 25, 2004, upon her intake evaluation into psychiatric treatment through North Central Missouri Mental Health Center, Michelle Lovett, MSW, PLCSW, diagnosed Watson with "major depressive disorder, recurrent, severe, without psychotic

7

features" and "panic disorder without agoraphobia" and assigned her a current GAF of 34, with a highest GAF over the past year of 37. Dr. Hogan diagnosed Watson with "recurrent depression, anxiety disorder, rule out somatoform disorder" and concludes that Watson has a "GAF 40, major impairment" on November 5, 2004.

Approximately a year later, after ongoing therapy sessions, on August 9, 2005, Dr. Wisdom diagnosed Plaintiff with "major depressive disorder, recurrent, moderate" and "panic disorder without agoraphobia" and assigned her a GAF score of 40. Dr. Hogan again diagnosed Watson with "recurrent major depression" and again concluded that Watson has a "GAF 40, major impairment" on February 3, 2006. This diagnosis was repeated on September 20, 2006; Dr. Wisdom then diagnosed Watson with "major depressive disorder, recurrent, severe, without psychotic features," and assigned her a current GAF of 41 and a highest GAF for the past year of 40.[3]

The medical record also shows that Watson continued to receive therapy for depression through the date of the ALJ's decision and thereafter.

Considering the record as a whole, the ALJ erred in ceasing his analysis at step two based on a finding that Watson did not have a severe impairment based on her mental health disability. Watson was repeatedly diagnosed with depression and anxiety disorders, and prescribed antidepressants. She also continually treated these ailments with therapy and

---

[3]A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, shoplifting) or serious impairment of social or occupational functioning (e.g., no friends, unable to keep a job). *See* Diagnostic and Statistical Manual of Mental Disorders, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR).

8

medication. Watson's GAF assessments from treating physicians consistently indicate she was markedly limited in several areas of mental health functioning.

The record shows that Watson suffered from more than "slight abnormalities" which interfered with her social or occupational functions. Even absent Watson's subjective complaints of her symptoms (which the ALJ found not entirely credible), significant evidence indicates that Watson met her *de minimus* burden at step two.

### B. The ALJ Erred in Not Addressing the Reports Prepared by Milburn

Watson also argues the ALJ's decision should be overturned because he did not take into consideration information from licensed nurse practitioner Milburn.

Milburn began treating Watson on August 31, 2004, and had seen Watson twenty times between that date and the time of the hearing. During one of those visits, on June 14, 2006, Milburn completed a "Physical Residual Functional Capacity Questionnaire" (RFC) regarding Watson's ability to work. In the RFC form, Milburn diagnosed Watson with "arthritis, depression, anxiety, post-surgical menopause [and migraine headaches]" and describes her symptoms as "severe fatigue, chronic joint pain, atrophic vaginitis, depression, [and] anxiety." She opines that Watson is "incapable of even low stress jobs"; that she can sit 15 minutes at one time, stand 10 minutes at one time, and sit and stand/walk less than 2 hours in an 8-hour day with normal breaks. Milburn also notes that Watson will have to take unscheduled breaks every 15 minutes "depending on activity;" and that she could lift and carry less than 10 pounds "rarely" in a competitive work situation.

9

Milburn, as a nurse practitioner, is considered an "other" medical source, and therefore her opinion is not accorded the controlling weight afforded "treating sources." The Social Security Administration has stated the ALJ's record should reflect these opinions from other medical sources. Social Security Ruling ("SSR") 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The SSA explains that the ALJ "generally should explain the weight given to opinions from these or 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id*. "Opinions from [other] medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id*; *see also* 20 C.F.R. §416.913(d) (information from medical sources other than licensed physicians, including information from treating nurses, may be used to show the severity of an impairment). Because these opinions are important and useful to a disability determination, if an ALJ decides to give an opinion from an acceptable medical source more weight than one from another medical source, like a nurse practitioner, the ALJ must explain the reasons for doing so. *See* SSR 06-3p.

In the instant case, the ALJ does not mention nurse Milburn's RFC questionnaire. The ALJ does not explain if he took Milburn's opinion into account, nor does the ALJ explain what weight (if any) was given to Milburn's determination.

The ALJ bases his denial of benefits in part on his belief that Watson's statements

10

concerning the limiting effects of her joint pain were not fully credible. Milburn is a medical source capable of providing evidence about the severity of Watson's impairments and, thus, the ALJ erred in neglecting to take into account her opinions. Furthermore, the ALJ was required to weigh all the evidence including Milburn's opinion. *See* 20 C.F.C. § 416.920(a)(3); *see also Willcockson v. Astrue,* 540 F.3d 878 (8th Cir. 2008) (ALJ should explain whether other source statement has been considered, how much, if any, weight should be assigned to them and why). Such a review is particularly important in the instant case where Milburn is the only examining practitioner to give an assessment of Watson's physical residual functional capacity.

## III. Conclusion

The ALJ's finding that Watson did not have a severe impairment with regard to her mental health disorders is not supported by substantial evidence. The ALJ also erred in neglecting to consider Milburn's opinions. Accordingly, it is hereby

ORDERED that Watson's petition [Doc. # 13] is GRANTED. The decision of the ALJ is REVERSED and the case is REMANDED for further consideration consistent with this Order.

 s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: <u>December 4, 2009</u>

Jefferson City, Missouri

12